1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT FOR THE

9              EASTERN DISTRICT OF CALIFORNIA

10

11   GRACIE DARLENE McCUE,          )        NO. CV-F-10-233 OWW/DLB
     LAWRENCE GENE McCUE, and       )
12   P.M., by and through his       )        MEMORANDUM DECISION AND
     guardian ad litem, GRACIE      )        ORDER GRANTING IN PART WITH
13   DARLENE McCUE,                  )        PREJUDICE, GRANTING IN PART
                                     )        WITH LEAVE TO AMEND, AND
14                                   )        DENYING IN PART DEFENDANTS'
                                     )        MOTION TO DISMISS OR FOR
15                  Plaintiffs,      )        MORE DEFINITE STATEMENT
                                     )        (Doc.7)
16            vs.                    )
                                     )
17                                   )
     SOUTH FORK UNION SCHOOL         )
18   DISTRICT, et al.,              )
                                     )
19                                   )
                    Defendants.      )
20                                   )
     _____)

21

22        On January 13, 2010, Plaintiffs Gracie Darlene McCue,

     Lawrence Gene McCue, and P.M., through his guardian ad litem,
23
     Gracie Darlene McCue ("Plaintiffs") filed a First Amended
24
     Complaint ("FAC") in the Kern County Superior Court against South
25
     Fork Union School District, Robin Shive, Shannon Damron, Karen
26

                              1

Zurin, Sabine Mixion (collectively "District Defendants"), Kern County, Child Protective Services aka Kern County Child Protective Services aka Kern County Department of Human Services, Linda Lopez, Gabriela Johnson, Kern County Sheriff's Department, James D. Stratton (collectively "County Defendants"), Rick Koernke, Sandy Koernke, and Does 1-100.  The action was removed to this Court on February 11, 2010.

Before the Court is the District Defendants' motion to dismiss the Fifth Cause of Action for Negligent Infliction of Emotional Distress, the Seventh Cause of Action for Violation of 42 U.S.C. § 1983, the Eighth Cause of Action for Violation of 42 U.S.C. § 1985, the Ninth Cause of Action for Violation of 42 U.S.C. § 1986, the Eleventh Cause of Action for Violation of California Civil Code §§ 43, 49, 51 and 52.1, the Twelfth Cause of Action for Intentional Infliction of Emotional Distress, and Fourteenth Cause of Action for slander, for failure to state a claim upon which relief can be granted.  The motion to dismiss is joined by the County Defendants as to the Fifth, Eighth and Ninth Causes of Action.  Alternatively, the District Defendants move for a more definite statement as to the Eleventh and Twelfth Causes of Action.

I.   <u>ALLEGATIONS OF FAC</u>.

The FAC alleges that Gracie McCue is the mother of the minor, P.M., and that Lawrence McCue is P.M.'s adopted father. Rick and Sandy Koernke are alleged to be P.M.'s foster parents. As "Common Allegations," the FAC alleges:

2

22.  Plaintiff P.M. is allergic to nuts.  On December 9, 2006, P.M. had a near fatal reaction to nuts.  After he was treated and released from Eisenhower Medical Center, Plaintiffs made appointments with Dr. Patrick Leung, M.D., in Bakersfield, California, to assess P.M.'s allergies.  Dr. Leung ran various tests and confirmed P.M. was very allergic to nuts and all nut products.

23.  On December 22, 2006, P.M.'s parents, DARLENE and LAWRENCE, personally hand carried all information in reference to P.M.'s newly discovered nut allergy to his school, South Fork Elementary School ('School'), which is part of the SOUTH FORK UNION SCHOOL DISTRICT ('DISTRICT') and had a meeting with the Principal of South Fork Elementary School, Ms. SHIVE, to discuss the accommodations that P.M. would need to keep him safe and accommodate his severe allergies and/or disabilities.  At this meeting, SHIVE refused to make reasonable accommodations, and instead stated that all she could do by way of accommodation is sit P.M. at a nut free table in the cafeteria for lunch.  She further insisted that South Fork Elementary School and the DISTRICT would not stop serving nuts or nut products.

24.  During the remainder of the 2006-2007 school year there were several meetings with the DISTRICT and its employees at which Plaintiffs requested the DISTRICT consider stop serving nut products, nuts, or food items containing nut products at the School to protect P.M. from any adverse reactions.  At those meetings, SHIVE repeatedly stated that the DISTRICT and the School, and the staff at those locations where P.M. received his education could not, and would not, stop serving nuts as requested by the McCues.  As a result, the DISTRICT, School, SHIVE, SHANNON DAMRON ('DAMRON,' the Second Grade Teacher at South Fork), KAREN ZURIN ('ZURIN,' the Office Assistant at South Fork), and SABINE Mixion ('MIXION'), and each of them personally refused to make any reasonable accommodations for P.M. or under his Individualized Education Plan as provided under the Individuals with Disabilities

3

Education Act, Section 504 of the
Rehabilitation Act, and/or the Americans with
Disabilities Act.

25.   P.M. started his second grade year on
August 21, 2007.  At the beginning of P.M.'s
2007-2007 school year, the McCues held
another meeting with SHIVE.  The McCues again
requested accommodations for P.M. to keep him
safe.  At this time, SHIVE allegedly stated
to Plaintiffs, 'We had a nut free table for
[P.M.] last year but we cannot do that this
year, all we can do to accommodate [P.M.] is
to make him eat his lunch in the office away
from all other children and this will keep
him safe.'  The McCues were dissatisfied with
this response and voiced their
dissatisfaction.  Several meetings after this
change in circumstance, the McCues requested
accommodations to allow P.M. to eat his lunch
in the lunchroom with all his friends.
However, SHIVE continued to insist that
eating in the office is all she, the
DISTRICT, and the School would do to
accommodate him during his lunch hour.

26. Meanwhile, from September of 2007 to
February of 2008, P.M. was very ill and
missed a lot of school.  During P.M.'s
illnesses, the McCues continued to ask the
School and the DISTRICT for accommodations
for P.M. regarding his severe allergies and
sought help from the DISTRICT regarding his
other illnesses.

27.  In September of 2007, a licensed medical
doctor diagnosed P.M. with an ear infection.
In October 0f 227, a licensed medical doctor
diagnosed P.M. with Gastroenteritis.  In
November of 2007, a licensed medical doctor
diagnosed P.M. with Streptococci Strep
Throat.  In December of 2007, a licensed
medical doctor diagnosed P.M. with Viral
Meningitis.  In January of 2008, a licensed
medical doctor diagnosed P.M. with a
Bacterial Blood Infection.  In February of
2008, [a] licensed medical doctor diagnosed
P.M. with Influenza B, a Sinus Infection, and
an Upper Respiratory Infection.  From
September of 2007, to December of 2007, P.M.
seemed to be getting much worse each month so

4

on January 7, 2008, the McCues contacted UCLA and set two appointments with their Doctors. The McCues scheduled an appointment with an immune specialist, and another appointment with a pain specialist, both on January 14, 2008, to examine P.M.

28.   At the appointments, the Doctors and UCLA ran several tests and drew blood from P.M.  Based upon those tests, Dr. Stiehm, Dr. Tachdijian, and UCLA diagnosed P.M. with Complex Regional Pain Syndrome (CRPS). Thereafter, STIEHM requested that P.M. be admitted to Mattel Children's Hospital at UCLA and told the McCues that if P.M. should get sick before the admission date (within a couple of weeks) that the McCues should immediately take him to the Mattel Children's Hospital at UCLA.

29.   On January 27, 2008, P.M. began to run [a] fever of 104 degrees Fahrenheit. Plaintiff DARLENE gave P.M. some Tylenol and the fever went down to 101 degrees Fahrenheit.  However, by the next day, P.M.'s fever was 105 degrees Fahrenheit.  Again, DARLENE gave P.M. Tylenol, but this time the fever was not reduced and the McCues proceeded to Kern Valley Hospital for immediate medical treatment.  At Kern Valley Hospital a Dr. Martin treated P.M.  Dr. Martin explained to the McCues that because P.M. had Viral Meningitis in December of 2007, P.M. may have Bacterial Meningitis this time.  Dr. Martin immediately suggested a lumbar puncture.  He explained to the McCues that if P.M. had bacterial meningitis it could cause death and that bacterial meningitis can be fatal for children.  Given the information provided by Dr. Martin, [the] McCues refused a lumbar puncture and requested Dr. Martin contact Stiehm at Mattel Children's Hospital at UCLA for immediate admission so that the McCues could immediately drive to Mattel Children's Hospital at UCLA by car and enter P.M. into the Hospital through the emergency room.  Dr. Martin then contacted Robert Roberts, M.D. Dr. Roberts confirmed to Dr. Martin that Dr. Stiehm had arranged to admit P.M. to Mattel Children's Hospital at UCLA in seven days.

5

Dr. Martin then gave P.M. antibiotics and a fever reducer and allowed P.M. to leave Kern Valley Hospital with the promise from the McCues that they would take P.M. immediately to Mattel Children's Hospital at UCLA.

30.   The McCues then drove directly to the emergency room at Mattel Children's Hospital at UCLA at about 5:30 a.m.  Upon arrival, Dr. Roberts was called to attend to P.M.  The McCues explained to Dr. Roberts that P.M. had been sick from September 2007 through January 2008, and they needed help to get their child well and keep him well.  At the request of Dr. Roberts and the Mattel Children's Hospital at UCLA, DARLENE signed several release forms so Mattel Children's Hospital at UCLA could get P.M.'s past medical records as part of the patient review process.  The McCues explained to Dr. Roberts that P.M. had a high fever for two days, the fever had not subsided with over-the-counter medication, that they had taken P.M. to Kern Valley Hospital due to the fever, and that Dr. Martin had seen P.M. at Kern Valley Hospital. The McCues further explained to Dr. Roberts that Dr. Martin insisted that P.M. needed an emergency lumbar puncture and the McCues had refused and requested to be released to get a second opinion from Mattel Children's Hospital at UCLA.  At this time Dr. Roberts explained to the parents that getting a second opinion was a great thing to do because he found no signs that told him that P.M. needed a lumbar puncture.  After Dr. Roberts completed his examination of P.M., Dr. Roberts explained to the McCues that he and Dr. Stiehm decided to go ahead and admit P.M. for a complete work up to find out why P.M. was getting sick.

31.   On January 29, 2008, P.M. was admitted to Mattel Children's Hospital at UCLA.  On January 30, 2008 at 8:00 a.m., South Fork School and the DISTRICT were notified that P.M. had been admitted to Mattel Children's Hospital at UCLA.  On February 2, 2008, the nurse at Mattel Children's Hospital at UCLA came into P.M.'s hospital room and told the McCues that P.M. had Influenza B, a Sinus Infection, and an Upper Respiratory

6

Infection.  Other tests were run by Dr. Stiehm to check P.M.'s immune system.  Those tests showed that P.M. had a strong immune system.  After a ten (10) day stay at Mattel Children's Hospital at UCLA, Mattel Children's Hospital at UCLA, UCLA, and its Doctors determined that P.M. had severe allergies and that those allergies could have been the reason he was getting sick so often.  Mattel Children's Hospital at UCLA, UCLA, and its Doctors explained to the McCues that because P.M. was having small reactions to food and other things each day that P.M.'s 'system' was run down so that he would easily become ill when exposed to germs, bacteria, or viruses that would not normally make others ill.

32.  On January 31, 2008, Ms. Borelli came to P.M.'s hospital room at Mattel Children's Hospital at UCLA and explained to the McCues that she had to run through some tests as per the Doctors' request at Mattel Children's Hospital at UCLA and UCLA.

33.  On February 28, 2008, South Fork Elementary School had an event so the middle school and elementary school children were present and all on the play ground all at once.  During that event, South Fork Elementary School served peanut butter cookies to all of the students with full knowledge that P.M. was allergic to peanuts.  Plaintiff DARLENE was at the School to help out and noticed P.M. began to have a severe rash starting to form over his body.  Plaintiff DARLENE asked Sherry Web, the lunch-room manager at the School, what was in the cookies and Ms. Web responded 'peanut butter.'  Plaintiff DARLENE realized at that point that P.M. was having a reaction to the peanut butter cookies and that this caused the rash.  Plaintiff DARLENE immediately removed P.M. from the School and took P.M. home.  Upon arriving home, P.M. began having trouble breathing.  Plaintiff DARLENE then telephoned P.M.'s allergist, Dr. Leung, and Dr. Leung instructed DARLENE to get P.M.'s Epi-pen and transport P.M. to Dr. Leung's office right away.  Plaintiff DARLENE then drove P.M. immediately to Dr. Leung's office

for medical treatment for the exposure to
nuts and nut products.

34.   After this incident, Plaintiff DARLENE
telephoned the State Board of Education to
see what could be done to get the DISTRICT to
accommodate P.M.'s allergies.

35.   The School [sic] Board of Education
informed Plaintiff DARLENE that SHIVE and the
DISTRICT were breaking the law and they would
call SHIVE right away and let her know that
she must make the appropriate accommodations
for P.M. under the educational laws.

36.   Plaintiff [sic] is informed and believes
and on such basis alleges that the school
staff, i.e., SHIVE, DAMRON, ZURIN, MIXION,
and the DISTRICT were reprimanded by the
State Board of Education.  And, thereafter
became angry toward the McCues, and acted
toward them with malice in doing the things
alleged herein below.

37.   The McCues believe and, therefore,
allege that SHIVE, DAMRON, ZURIN, MIXION, and
the DISTRICT and its staff elected,
intentionally, to disregard their obligations
to P.M. under state and federal law, and to
work toward removing P.M. from the DISTRICT,
or otherwise intimidating the McCues so that
they would not pursue their rights to
accommodations for their child.  Plaintiffs
are further informed and believe and on such
basis allege that the DISTRICT sought to
avoid, and did avoid, its obligations to make
reasonable accommodations for P.M.'s
condition, and did so maliciously.

38.   After receiving a referral for potential
child endangerment from Dr. Bekmezian at UCLA
in early February 2008, the KERN COUNTY
SHERIFF'S DEPT., unbeknowst to Plaintiffs,
initiated an investigation into the medical
condition of P.M.  This investigation
included the review of most medical records
of P.M. and took several weeks.  Before the
investigation was complete, CPS and JAMES D.
STRATTON ('STRATTON') made the decision to
remove P.M. from the custody of his parents,
in the absence of exigent circumstances and

8

without a reasonable belief that the child was in imminent danger of serious bodily injury.  On or about March 6, 2008, CPS and the KERN COUNTY SHERIFF'S DEPARTMENT and STRATTON arrived at South Fork Elementary School, without any notice to the McCues, and removed P.M. from School around 11:30 a.m. without first obtaining a warrant to do so. No one notified P.M.'s Parents (the McCues) until 2:30 p.m., at which time STRATTON met with the McCues at their home.  STRATTON told the McCues that P.M. had been taken away because Plaintiff DARLENE took too good a care of P.M. and was at school with P.M. too much and that they had received a complaint that maybe P.M. had received way too much medical attention.

39.  At no time prior to P.M.'s removal and detention did any Defendant attempt to obtain a warrant or other court order authorizing the removal of P.M.  Plaintiffs are informed and believe, and on that basis allege that the removal was done in secret, without a warrant, in the absence of exigent circumstances, and in the absence of any imminent danger of serious bodily injury in accordance with the general policies, practices and customs of KERN COUNTY and its SHERIFFS.

40.  After CPS removed P.M. from the McCues' home, P.M. was transferred out of the DISTRICT to a school located in Bakersfield, California. SHIVE remained in contact and continued to disclose confidential information to Mattel Children's Hospital at UCLA, UCLA, its Doctors, and Ms. Borelli without any legal basis to do so.

41.  Defendant SHIVE called Plaintiff DARLENE on the telephone on March 7, 2009 [sic], the morning after P.M. was taken away from the McCues by CPS.  She already knew P.M. had been removed and detained.  During the telephone conversation she sarcastically asked DARLENE 'How is [P.M.]?'  When Plaintiff DARLENE responded, SHIVE, in a retaliatory and threatening manner, responded: 'Well, when you have a problem with me, you don't call the School [sic]

9

Board of Education.  You deal with me only.'
SHIVE intimated that she was in fact the
driving force behind P.M.'s removal and
detention, and that said removal was in
retaliation for DARLENE's efforts to lawfully
obtain reasonable accommodations for her son.

42.  On March 10, 2008, without Plaintiffs'
knowledge or consent, Ms. DAMRON, P.M.'s
teacher at the DISTRICT, announced to P.M.'s
whole class with all classmates present that
'P.M. had been taken away from his parents
and put in a foster home and now he will be
safe and he would not be coming back.'  In
the afternoon on March 10, 2008, the McCues
began receiving telephone calls from parents
of children in P.M.'s class asking if it was
true that P.M. had been taken away.  The
McCues told the parents it was true and asked
how they found this out.  The parents of
P.M.'s classmates stated that their children
came home telling them that Ms. Damron
announced to the class after lunch that P.M.
had been taken away from his parents and put
in a foster home and that he would now be
safe and would not be coming back to school
in violation of the McCue's [sic]
constitutional right to privacy arising under
Article 1, Section 1 of the California
Constitution.  The McCues then received
letters from several children and their
families describing what Ms. DAMRON had
stated.

43.  After P.M. was taken away on March 6,
2008, the McCues were not allowed to see or
speak to P.M. for four (4) days.  P.M.
suffered emotionally and physically due to
his removal from the McCues.  CPS placed P.M.
in a foster home in Bakersfield, California.
After being placed in the foster home, P.M.
was not allowed to attend school for a month.
P.M. was not allowed to take his medications
for three (3) weeks.  P.M. was not allowed to
have his epi-pen with him for a month even
though P.M.'s doctors had ordered that P.M.
have the epi-pen with him at all times.  The
temporary foster parents, Mr. and Mrs.
Slatton, eventually told the McCues that CPS
would not give them any of P.M.'s medical
information so the foster parents could not

10

enroll P.M. in school.

CPS also did not give Mr. and Mrs. Slatton the proper information on P.M.'s allergies and what to do if P.M. had a reaction.  While with Mr. and Mrs. Slatton, the social worker, MS. LOPEZ told Plaintiff DARLENE that CPS did not believe had nut allergies and that the foster family would feed P.M. whatever they wanted and there was nothing Plaintiff DARLENE could do about it.  Also, MS. LOPEZ told the McCues that CPS told the foster parents to feed the other children nut products and make P.M. play with these kids so that CPS could find out if P.M. really had a nut allergy.  At this point, the McCues asked MS. LOPEZ if P.M. were to have a reaction and die in CPS's care would they tell the parents and MS. LOPEZ said 'sometimes' and proceeded to smile maliciously at the McCues.

44.  MS. LOPEZ and MS. JOHNSON investigated and prepared reports for filing with the Kern County Superior Court, which accused the McCues of causing or potentially causing serious physical harm to P.M., failing to protect P.M., causing serious emotional damage to P.M., committing acts of cruelty against P.M., and failing to protect P.M. against acts of cruelty.  Based upon the inaccurate, false and uninvestigated statements in those reports by MS. LOPEZ and MS. JOHNSON, CPS supported the complaint against the McCues without further investigation and with the knowledge that its claims were false and unsupported by any evidence.

45.  On March 7, 2008, the McCues met OFFICER JAMES D. STRATTON at the KERN COUNTY SHERIFF'S DEPARTMENT in Lake Isabella, California, and presented all medical records and documents in their possession to prove P.M. needed the medical treatment he had received in the past seven (7) years.  OFFICER STRATTON stated that the McCues had proven their innocence to him and he agreed P.M. should not have been taken.

46.  Notwithstanding the foregoing, SHERIFF

11

DEFENDANTS and CPS prepared a Juvenile
Dependency Petition filed in the Superior
Court, County of Kern, Metropolitan Division
- Juvenile Justice Center that contained
knowingly false information and purposely
suppressed, and failed to include,
exculpatory evidence.  Said defendants, and
each of them, participated in the fabrication
of evidence with the intent to submit that
false evidence to the Court.  Thereafter, on
July 15, 2008 and September 26, 2008, Social
Studies and Supplemental Reports that related
to the McCues contained knowingly false
information and purposely suppressed
exculpatory evidence.

47.  In submitting such documentation,
DEFENDANTS, including Defendant LOPEZ
intentionally and knowingly did so with a
conscious disregard for the rights and well
being of the McCUE family, and in fact did so
with actual malicious intent in that she
desired to punish the McCues.

48.  On April 4, 2008 P.M. was moved to a
second foster home in Lake Isabella,
California.  The new foster parents were the
KOERNKES.  While residing with and under the
care of the KOERNKES, the KOERNKES allegedly
abused P.M. and treated him cruelly.
Specifically, P.M. was not allowed by the
KOERNKES to say when he was in pain.  P.M.
was told by the KOERNKES that if he showed
any signs of being in pain he would not get
to eat.  The KOERNKES then withheld food from
P.M. as punishment for saying he was having
any pain.  The KOERNKES coerced and forced
P.M. to sit in the car unattended while the
KOERNKES went inside various stores to buy
food.  The KOERNKES would offer money to P.M.
not to tell the social worker and the McCues
how the KOERNKES treated him.  The KOERNKES
also withheld food from P.M. and told him
that it he did not tell the social worker and
the McCues what they told him to say, that he
would not get food and would not see his
parents again.  On those occasions when SANDY
KOERNKE believed that P.M. had said something
she had not approved, he was sent to bed
hungry and without dinner.  The KOERNKES also
made P.M. do chores to earn food.  If P.M.

12

did not complete the chores, the KOERNKES
limited food to P.M. to small portions to
control him.  This continued to occur even
though the McCues paid the KOERNKES
additional money per month for P.M. above and
beyond what they were required to pay and
what the KOERNKES received through CPS and
the foster care system (approximately
$485.00).  SANDY KOERNKE also during this
time told P.M. she could not afford food for
him, they needed money to take care of P.M.,
and failed to reveal and suppressed the fact
that they would be and/or were already
getting money in the approximate amount of
$485.00 from CPS and/or the foster care
system, a fact which was known to the KOERNKE
DEFENDANTS at all times herein mentioned.
These statements that they could not afford
food and needed money to take care of P.M.,
coupled with the suppression of the fact that
they were receiving money from CPS and/or the
foster care system lead the McCues to believe
that the KOERNKE's [sic] did not have the
funds to take care of P.M. and that it was
the McCues responsibility to provide money
for his case to the KOERNKE's [sic].
Therefore, the McCues gave the KOERNKE's
[sic] additional monies each month so that
the KOERNKE's [sic] could take care of their
son.  At the time the McCues were giving the
KOERNKE's [sic] the additional funds they did
not know that CPS and/or the foster care
system was also providing the KOERNKE's [sic]
with $485.00 per month to take care of P.M.
The McCues relied on the representations of
the KOERNKE DEFENDANTS to their detriment.
Had they known the KOERNKE's [sic] were
receiving money from CPS and/or the foster
care system, they would never have given the
KOERNKE's [sic] money to take care of P.M.

49.  In addition, while P.M. was at the
KOERNKES' home, CPS insisted P.M. attend
school again in the DISTRICT as the School
(South Fork Elementary School).

50.  During the time P.M. was in the home of
the KOERNKE DEFENDANTS, the CPS DEFENDANTS
did not conduct any visits with P.M. at the
home of the KOERNKE's [SIC] in order to
monitor the placement of P.M., a mandatory

13

1       statutory duty under the law.

2         51.  Due to P.M.'s removal from his Parents, missing school and abuse at the second foster home, he developed extreme anxiety and became afraid to eat the food at school given the incident with the peanut butter cookies at the School.  He has been diagnosed with Post Traumatic Stress Disorder.  To complicate this, after the DISTRICT and MS. SHIVE stated the School was 'nut free,' on April 16, 2008, the DISTRICT passed out a snack to the students in the classroom and this snack contained nuts and/or nut products.  P.M. refused to eat this snack and was given another snack.  This only increased P.M.'s fear of school.

         52.  After returning home on July 15, 2008, P.M. is not the same child that CPS removed, now cries very easily, he hides behind his parents if a car drives by, he wets his pants, talks like a baby, will not sleep alone, sleeps with a teddy bear, hides food, takes more food than he can eat, cries if he thinks he may not get food when it is meal time, does not want to be alone, even for a minute.  He panics if his parents leave the room.  He has panic attacks if someone talks about school or going to school, says he hates school, and does not trust any teachers.  He believes he will be taken away again if he leaves his Parents' side.  He is in therapy and on medication to cope with what has happened to him.  He suffered emotionally and physically in the second foster home run by the KOERNKES.  He suffered emotionally and physically when MS. LOPEZ told him when he was first taken that 'if he did not stop crying he would never see his parents again.'

         53.  The McCues and each of them have had to go seek medical and psychological counseling and services due to the conduct of Defendants, and each of them.  They too suffered as a result of comments by MS. LOPEZ who stated that if they said the wrong thing while they were visiting P.M. that they would never get to see him again.

14

54.  On or about September 3, 2008, plaintiffs presented a written claim for damages to Defendants (hereinafter 'the public entity defendants') for the acts described in this complaint.  On or about October 23, 2008 (pursuant to an extension entered into between the Defendant DISTRICT and the plaintiffs) plaintiffs presented a written amended claim for damages to the defendants intended to address the insufficiencies alleged by the South Fork Union School DISTRICT) in response to the initial claim filed by Claimants on or about September 3, 2008.  Plaintiffs' claims were all rejected.

II.   <u>MOTION TO DISMISS</u>.

A.   <u>Governing Standards</u>.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001).  Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).  "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its

15

1  face.'" *Williams ex rel. Tabiu v. Gerber Products Co.,* 523 F.3d

2  934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombley*,

3  550 U.S. 544, 570 (2007).  "'Factual allegations must be enough

4  to raise a right to relief above the speculative level.'" *Id.*

5  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

6  does not need detailed factual allegations, a plaintiff's

7  obligation to provide the 'grounds' of his 'entitlement to

8  relief' requires more than labels and conclusions, and a

9  formulaic recitation of the elements of a cause of action will

10  not do." *Bell Atlantic, id.* at 555.  A claim has facial

11  plausibility when the plaintiff pleads factual content that

12  allows the court to draw the reasonable inference that the

13  defendant is liable for the misconduct alleged.  *Id.* at 556.  The

14  plausibility standard is not akin to a "probability requirement,'

15  but it asks for more than a sheer possibility that a defendant

16  has acted unlawfully, *Id.*  Where a complaint pleads facts that

17  are "merely consistent with" a defendant's liability, it "stops

18  short of the line between possibility and plausibility of

19  'entitlement to relief.'" *Id.* at 557.  In *Ashcroft v. Iqbal*, ___

20  U.S. ___, 129 S.Ct. 1937 (2009), the Supreme Court explained:

> Two working principles underlie our decision
> in *Twombley*.  First, the tenet that a court
> must accept as true all of the allegations
> contained in a complaint is inapplicable to
> legal conclusions.  Threadbare recitations of
> the elements of a cause of action, supported
> by mere conclusory statements, do not suffice
> ... Rule 8 marks a notable and generous
> departure from the hyper-technical, code-
> pleading regime of a prior era, but it does
> not unlock the doors of discovery for a

16

plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss ... Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense ... But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.' ....

In keeping with these principles, a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint.  *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)  When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice.  *Parrino v. FHP, Inc*, 146 F.3d 699, 705-706 (9th Cir.1988).

B. Fifth Cause of Action for Negligent Infliction of Emotional Distress.

17

District Defendants and County Defendants move to dismiss the Fifth Cause of Action for negligent infliction of emotional distress on the ground that California case law does not recognize an independent tort of negligent infliction of emotional distress; rather, the claim is a type of negligence. *See Lawson v. Management Activities, Inc.*, 69 Cal.App.4th 652, 656 (1999). It is well settled that negligent infliction of emotional distress is not an independent tort; rather it is the tort of negligence to which the duty of care, breach of duty, causation and damage elements apply. *See Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal.3d 583, 588 (1989); *see also Friedman v. Merck & Co.*, 107 Cal.App.4th 454 (2003)(no duty to avoid negligently causing emotional distress to another, a duty must arise (1) independently by law and (2) be assumed by defendant or found through some special relationship between the parties).

Plaintiffs do not respond to this ground for dismissal and by lack of response concede that dismissal with prejudice of the Fifth Cause of Action is appropriate.

Defendants' motion to dismiss the Fifth Cause of Action with prejudice is GRANTED.[1]

C.   Seventh Cause of Action for Violation of 42 U.S.C. § 1983.

---

[1]The Fourth Cause of Action for Negligence is brought by P.M. against the County Defendants and the Koernke Defendants only; it is not alleged against the District Defendants.

18

The District Defendants move to dismiss Count Three of the Seventh Cause of Action for denial of reasonable accommodations in violation of 42 U.S.C. § 1983 on the ground that Plaintiffs have failed to comply with the IDEA.[2]

Count Three "re-alleges, and to the extent applicable, incorporates by reference ... all paragraphs from the Common Allegations." Count Three further alleges in pertinent part:

> 147.  The Individuals with Disabilities Education Act (IDEA) is a federal education law that forms the foundation for special education throughout the country.  It helps guarantee that students with disabilities from birth through age 21 receive a 'free appropriate public education' so that they can go to school every day, learn what other students learn, but in different ways, and have their individual educational needs determined and addressed.  The obligations arising under the IDEA are mandatory statutory obligations which rise to the level of a constitutional rights [sic] in favor of the beneficiaries of said Statutory [sic] construct.  See e.g. Carlo v. City of Chino, 105 F.3d 493, 502 (9th Cir.1997).

> 148.  Plaintiff P.M. is a member of the class protected by the aforementioned statute, and others.

> 149.  As set forth in some measure of detail above, the District Defendants were obligated to make reasonable accommodations in light of P.M.'s condition and refused to do so.  In so refusing, the District Defendants, and each of them, violated P.M.'s Fourth and Fourteenth Amendment rights.

> 150.  Plaintiff [sic] is informed and

_____

[2]Count One is brought by Plaintiff P.M. against the County Defendants for unlawful seizure.  Count Two is brought by all Plaintiffs against the County Defendants for deprivation of familial association.

1  believes and on such basis alleges that the
   aforementioned duties are 'clearly
2  established' such that a reasonable school
   official in Defendants' situation would know
3  it is unlawful to do the things herein
   alleged without due process of law.
4
   151.  In addition, there is a Constitutional
5  privacy interest in maintaining the
   confidentiality of ones [sic] private affairs
6  which may not be impinged upon by the
   government, or its actors.  Plaintiffs are
7  informed and believe and on such basis allege
   that said privacy interest is so clearly
8  established that any reasonable school
   official faced with similar circumstances
9  would know it is unlawful to publish to the
   entire class room, the private affairs of
10 P.M. and his parents, as alleged herein.

11 152.  Defendants, without privilege to do so,
   knowingly, willfully, and intentionally
12 violated the rights of P.M. when they refused
   to make reasonable accommodations for his
13 illness, and further violated the privacy
   interests of all Plaintiff's when Defendants
14 announced to P.M.'s entire class that P.M.
   had been removed for DARLENE and LAWRENCE,
15 and the purported reasons why.

16    The IDEA is a comprehensive educational scheme that confers

17 on students with disabilities a substantive right to public

18 education.  *See Van Duyn v. Baker Sch. Dist. 5J*, 481 F.3d 770,

19 776 (9th Cir.2007); *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.3d

20 1298, 1300 (9th Cir.1992).  The IDEA provides financial

21 assistance to enable states to meet their educational needs, but

22 conditions funding on the effectuation of a policy that assures

23 all children with disabilities the right to a free appropriate

24 public education ("FAPE").  20 U.S.C. § 1412(a)(1).  To that end,

25 the IDEA requires that school districts develop an IEP for each

26 child with a disability.  *See Winkleman ex rel. Winkleman v.*

20

*Parma City Sch. Dist.*, 550 U.S. 518 (2007).  When a party is dissatisfied with "the adequacy of the education provided, the construction of the IEP, or some related matter," *Winkleman*, *id.* at 525, the IDEA provides a procedural recourse.  Participating states are required to establish procedures giving an opportunity for any party to present a complaint concerning an IEP.  20 U.S.C. § 1415(b)(6)(A).  California has adopted legislation to comply with these procedures.  *See* California Education Code § 56500-56507; 5 California Code of Regulations §§ 3040-3054.  20 U.S.C. § 1415(l) provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent was would be required had the action been brought under this subchapter.

"The IDEA requires a plaintiff to exhaust his or her administrative remedies before commencing suit if that person is 'seeking relief that is also available under' the IDEA." *Robb v. Bethel School Dist. # 403,* 308 F.3d 1047, 1049 (9th Cir.2002). *Robb* explains:

> [A] plaintiff cannot avoid the IDEA's exhaustion requirement merely by limiting a prayer for relief to money damages.  We understand 'available' relief to mean relief suitable to remedy the wrong done the plaintiff, which may not always be relief in

21

1                  the precise form the plaintiff prefers ...
                   Our primary concern in determining whether a
2                  plaintiff must use the IDEA's administrative
                   procedures relates to the source and nature
3                  of the alleged injuries for which he or she
                   seeks a remedy, not the specific remedy
4                  requested.  The dispositive question
                   generally is whether the plaintiff has
5                  alleged injuries that could be redressed to
                   any degree by the IDEA's administrative
6                  procedures and remedies.  If so, exhaustion
                   of those remedies is required.  If not, the
7                  claim necessarily falls outside the IDEA's
                   scope, and exhaustion is unnecessary.  Where
8                  the IDEA's ability to remedy a particular
                   injury is unclear, exhaustion should be
9                  required to give educational agencies an
                   initial opportunity to ascertain and
10                 alleviate the alleged problem.

11  *Id.* at 1049-1050.

12       The District Defendants assert that Count Three of the

13  Seventh Cause of Action clearly and unquestionably falls under

14  the IDEA, contending that Count Three attempts to assert that

15  they violated the IDEA by denying reasonable accommodations for

16  P.M.'s peanut allergy.  Plaintiffs do not allege that they made

17  any formal complaint or exhausted the procedural requirements of

18  the IDEA prior to filing this action.  Therefore, Plaintiffs have

19  failed to comply with these requirements and Plaintiffs' claim

20  fails as a matter of law.

21       Plaintiffs respond that Count Three alleges more than a

22  violation of the IDEA by denying reasonable accommodations.

23  Plaintiffs refer to the allegations concerning the alleged

24  invasion of privacy set forth in Paragraphs 151 and 152.

25  Plaintiffs also refer to the allegations in Paragraphs 33-44,

26  incorporated by reference in Count Three, asserting that

Plaintiffs have alleged "that an employee of the District became upset with Plaintiff for 'going over her head' and decided, in conspiracy with others in positions of authority, to retaliate against Plaintiffs by orchestrating the events complained of herein, including having Plaintiff P.M. removed from his parents by reports that were not true" and further asserting that, at the date of the alleged invasion of privacy, P.M. had already been removed from the school and the custody of his parents.

Plaintiffs contend that the District Defendants failed to address these allegations in their opening brief and should not be given the opportunity to address these allegations for the first time in their reply brief, thereby depriving Plaintiffs of the opportunity to respond.  Generally, issues raised for the first time in a reply brief are considered waived.  *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir.1990).

However, the Court has discretion to consider arguments made in response to an opposition brief.  In addition, the issue presented is whether, in the context of IDEA cases, the Ninth Circuit recognizes the requirement of exhaustion of administrative remedies as jurisdictional in nature.  *See Robb v. Bethel Sch.* Dist. *# 403*, 308 F.3d 1047 (9th Cir.2002), *Dreher v. Amphitheater Unif. Sch. Dist.*, 22 F.3d 228, 221 (9th Cir.1994).  The District Defendants' arguments in reply to Plaintiffs' opposition will be considered.  Any prejudice to Plaintiffs was negated by oral argument.

In any event, Plaintiffs argue that "the flaw in Defendants'

motion is that the aforementioned claims of P.M. and his parents
are not 'also available under this part' under 20 U.S.C. §
1451(l)."  Plaintiffs contend there was no administrative
exhaustion requirement "for such allegations." Plaintiffs argue
that "the contentions are that the disclosure made in the class
room was part and parcel of a conspiracy to retaliate against
Plaintiffs, including setting in motion the wrongful removal of
the child from the parents based on falsehoods."

The District Defendants respond that Plaintiffs' attempt to
focus on the allegations in Paragraphs 151-152, ignores that the
caption of Count Three is "denial of reasonable accommodations"
pursuant to the IDEA and belies that Plaintiffs are actually
attempting to allege a conspiracy to retaliate or an allegation
of slander in Count Three.  The District Defendants assert:

> Even if this were not the case ..., the
> application of Plaintiffs' arguments would
> result in the failure of Plaintiffs' claims
> for violation of the IDEA, as a matter of
> law.  This is because the IDEA was enacted to
> insure that all handicapped children have
> appropriate, free public education and
> associated services available to them, and an
> allegation of conspiracy to retaliate and/or
> slander regarding P.M. [sic] placement in
> foster care in no way supports a claim for
> violation of the IDEA and/or the failure to
> provide a reasonable accommodation.

The District Defendants assert that the crux of Count Three is a
claim that the District Defendants violated the IDEA by denying
reasonable accommodation for P.M.'s peanut allergy, which
included retaliation and invasion of privacy.

Plaintiffs further argue that, even if administrative relief

24

were applicable, such relief would have been futile.   Plaintiffs cite *Witte v. Clark County School Dist.*, 197 F.3d 1271 (9th Cir.1999), and *Blanchard v. Morton School Dist.,* 420 F.3d 918 (9th Cir.2005).

In *Witte*, a student with Tourette's Syndrome filed a civil action seeking damages for past physical and emotional abuse after he was allegedly force-fed food to which he was allergic, strangled, subjected to "take downs," forced to walk and run despite hindering deformities, and deprived of food.  197 F.3d at 1271.  The *Witte* Court decided exhaustion was not necessary because the parties (1) had resolved all educational issues through the IEP process, (2) sought only retrospective damages, and (3) had claims centering around physical abuse and injuries. 197 F.3d at 1276-1276.

In *Blanchard*, the mother of an autistic child brought a Section 1983 action for damages for alleged emotional distress to her caused by the conduct of the defendants in providing special education services to her son under the IDEA and for reimbursement for the income she lost while pursuing her son's remedies under the IDEA.  The District Court granted the defendants' motion to dismiss, concluding that Blanchard had failed to exhaust administrative remedies under the IDEA.  The Ninth Circuit reversed:

> The remedies available under the IDEA include educational services for disabled children ... They do not provide an adequate remedy for Blanchard.

We held in *Witte* that a plaintiff seeking monetary relief for alleged past physical and emotional abuse by school staff was not required to exhaust administrative remedies under the IDEA ... We emphasized that 'all educational issues already had been resolved to the parties' mutual satisfaction through the [administrative] process.' ... That is true here, as well.  Following *Witte*, we hold that Blanchard had no remedies under the IDEA to exhaust.  Blanchard had resolved the educational issues implicated by her son's disability and had obtained the educational relief available under the IDEA on behalf of her son.

The District relies on *Robb*.  In that case, a student with cerebral palsy and her parents sought damages for lost educational opportunities, emotional distress, humiliation, embarrassment, and psychological injury after the student was removed from the classroom for extended tutoring.  *Robb*, 308 F.3d at 1048.  We held that because these injuries could be remedied to some degree by the IDEA's administrative procedures and remedies, the plaintiffs must exhaust those administrative remedies before filing suit.  *Id.* at 1054.  We stated: 'Where, as here, a plaintiff's injuries are part and parcel of the educational process, we must give the local administrators the first opportunity to remedy them.'  *Id.* at 1053 n.4.  In this case, however, Blanchard's emotional distress injuries and lost income could not be remedied through the educational remedies available under the IDEA.  *See Witte*, 197 F.3d at 1275.

The District also stresses that the IDEA requires school to provide 'related services' to education, including 'psychological services, ... social work services [and] counseling services, ... as may be required to assist a child with a disability to benefit from special education.  20 U.S.C. § 1402(26)(A) ... The regulations implementing the statute provide that the required psychological services may include '[p]lanning and managing a program of psychological services, including

26

1
> psychological counseling for children and
> parents.' ... The act thus has some provision
2
> for counseling parents, but only with respect
> to assisting the child ... The psychological
3
> services available under the IDEA would not
> provide a remedy for Blanchard's own claims
4
> of emotional injury.

5
**420 F.3d at 921-922.**

6
Plaintiffs acknowledge that the Ninth Circuit in *Robb v.*

7
*Bethel School Dist., supra*, and *Kutasi v. Las Virgenes Unified*

8
*School Dist.*, "somewhat circumscribe[] the foregoing

9
authorities." Plaintiffs assert, however, that even under *Robb*

10
and *Kutasi*, Plaintiffs would not be required to exhaust

11
administrative remedies:

12
> In the case at bar, the educational issues
> are merely the background for an alleged
13
> conspiracy - as alleged in more detail for
> example in Counts One and Two of the Seventh
14
> Cause of Action. They are not at issue by
> the claim.[3] The horrible and damaging
15
> disclosure directly related to, and was in
> support of, such unlawful conduct. The child
16
> had already been removed from the home by CPS
> and was in its custody, thus precluding
17
> Plaintiffs DARLENE and LAWRENCE MCCUE from
> bringing any administrative claim. The
18
> administrative process could neither correct
> that problem nor award compensation for the
19
> act complained of herein. As such,
> exhaustion was not required.
20
> [3]To the extent this claim may, in part, be
21
> read otherwise, Plaintiffs recognize that
> those allegations, and not the allegations in
22
> paragraphs 151 and 152, likely would be
> subject to exhaustion.
23

24
The District Defendants reply that Plaintiffs are not exempt

25
from the exhaustion requirement based on their contention that

26
P.M. had already been removed by CPS. Citing 20 U.S.C. §

27

1415(b)(7)(B) and (c), the District Defendants contend that the
IDEA requires that a request for an impartial due process hearing
be brought within two years of the date the parent or agency knew
or should have known about the alleged action that forms the
basis of the complaint.

There is nothing in the statutes cited by the District
Defendants that sets forth a two year limitations period to
request an impartial due process hearing.  However, 20 U.S.C. §
1415(f)(3)(C) provides:

> A parent or agency shall request an impartial
> due process hearing within 2 years of the
> date the parent or agency knew or should have
> known about the alleged action that forms the
> basis of the complaint, or, if the State has
> an explicit time limitation for requesting
> such a hearing under this subchapter, in such
> time as the State allows.

California Education Code § 56505(l) provides:

> A request for a due process hearing arising
> under subdivision (a) of Section 56501 shall
> be filed within two years from the date the
> party initiating the request knew or had
> reason to know of the facts underlying the
> basis for the request.  In accordance with
> Section 1415(f)(3)(D) of Title 20 of the
> United States Code, the time period specified
> in this subdivision does not apply to a
> parent if the parent was prevented from
> requesting the due process hearing to either
> of the following:
>
> (1) Specific misrepresentations by the local
> educational agency that it has solved the
> problem forming the basis of the due process
> hearing request.
>
> (2) The withholding of information by the
> local educational agency from the parent that
> was required under this part to be provided
> to the parent.

28

The District Defendants argue:

> Here, Plaintiffs contend that District
> Defendants first failed to make a reasonable
> accommodation in December of 2006, and
> according to the FAC, P.M. was not removed
> from his parents home until March 6, 2008.
> Additionally, P.M. was subsequently returned
> home on July 15, 2008, and the FAC was not
> filed until January 2010.  As such,
> Plaintiffs had ample time to file an
> administrative complaint and exhaust
> administrative remedies prior to the filing
> of the instant action.

The District Defendants further note that *Witte* and *Blanchard* are distinguishable from the allegations in the FAC; Plaintiffs do not allege, as  iin *Witte* and *Blanchard*, that the educational issues had been settled to the parties' mutual satisfaction prior to the filing of the civil action.

To the extent that Count Three of the Seventh Cause of Action alleges a violation of the IDEA, the motion to dismiss is GRANTED WITH LEAVE TO AMEND for failure to comply with the IDEA's procedural requirements.  Plaintiffs' allegations that the District Defendants failed to provide a reasonable accommodation for P.M.'s peanut allergy is an injury that could be redressed to any degree by the IDEA's administrative procedures.  In fact, Plaintiffs allege that Darlene called the State Board of Education to complain about the actions of school personnel regarding P.M.'s allergy.  Plaintiffs' attempt to circumvent these requirements by focusing on the allegations of invasion of privacy through the statement of Defendant Damron and by asserting a conspiracy to obtain P.M.'s removal from the school,

ignores the actual allegations of the FAC and of Count Three. However, the allegations in Paragraphs 151-152 may be stand alone if stated as separate claims independent of the IDEA and its procedural requirements.  Because the pleadings are obscure, the motion to dismiss the Seventh Cause of Action is GRANTED WITH LEAVE TO AMEND.[3]

D.   <u>Eighth Cause of Action for Violation of 42 U.S.C. § 1985</u>.

District Defendants and County Defendants move to dismiss the Eighth Cause of Action for violation of 42 U.S.C. § 1985.

The Eighth Cause of Action is brought by all Plaintiffs against all Defendants.  The Eighth Cause of Action "re-alleges, and to the extent applicable, incorporates by reference herein as if set forth in full, all paragraphs from the Common Allegations above, and the First through Seventh Causes of Action."  The Eighth Cause of Action then alleges:

> 160.  DEFENDANTS, and each of them, acting under color of state law, conspired to deprive, and did deprive, PLAINTIFFS of their rights under the laws of the United States.
>
> 161.  Specifically, DEFENDANTS conspired to, and did: unlawfully seize and remove the minor Plaintiff from the care of his parents,

_____

[3]For clarity and fairness to Defendants and the Court, Plaintiffs must incorporate by reference the specific preceding paragraphs upon which they rely in stating a claim.  Wholesale incorporation of all preceding allegations, no matter how relevant or against which Defendant, is not helpful to the determination whether a claim has been stated, especially with allegations of this complexity.  Further, the Court expresses no opinion whether or not the Amended Complaint will be subject to the administrative exhaustion requirements of the IDEA.

1  without a warrant, court order, consent,
   probable cause, or exigent circumstances; on
2  information and belief denied PLAINTIFFS
   their right to a hearing on said detention
3  within 72 hours of the removal; and continued
   to detain minor Plaintiff P.M. for an
4  unreasonable period after any alleged basis
   for detention had been negated.
5
   162.   In addition, DEFENDANTS, and each of
6  them, conspired to use trickery, duress,
   fabrication and/or false testimony or
7  evidence, and failed to disclose exculpatory
   evidence in preparing and presenting reports
8  and court documents to the Court.  The
   conduct of DEFENDANTS, and each of them,
9  interfered with Plaintiffs' rights, including
   minor Plaintiff's right to be protected
10 against unlawful seizure under the Fourth
   Amendment of the Constitution of the United
11 States, and the right to familial association
   free from government interference as
12 guaranteed by the Fourteenth Amendment ....

13 163.   DEFENDANTS, and each of them, engaged
   in said conspiracies for the purpose of
14 depriving Plaintiffs equal protection of the
   laws of the State of California and of the
15 United States, and depriving them of their
   rights under the Constitutions of the United
16 States and the State of California.  (Need
   allegations of protected class here).
17
   164.   COUNTY DEFENDANTS, and each of them,
18 took several acts in furtherance of the
   conspiracy, including but not limited to:
19 unlawfully removing and detaining minor
   Plaintiff P.M. from the care of his parents
20 without a warrant, court order, consent,
   probable cause, or exigent circumstances;
21 continuing to detain P.M. for an unreasonable
   period after any alleged basis for detention
22 had been negated; and by procuring false
   testimony, fabricating evidence, and failing
23 to disclose exculpatory evidence in preparing
   and presenting reports and court documents to
24 the Court in relation to P.M.'s dependency
   proceedings.
25
   The Eighth Cause of Action does not specify which clause of
26

31

Section 1985 it invokes.  Plaintiffs conceded at the hearing that Section 1985(2), which makes unlawful a conspiracy to deter any party or witness from attending federal court or testifying in federal court <u>or</u> a conspiracy to obstruct justice in any state court with the intent of depriving any citizen of the equal protection of the laws, has no application to this action. Section 1985(2) contains two clauses that give rise to separate causes of action.  To state a claim under the first clause of Section 1985(2), plaintiffs must allege the following elements: (1) a conspiracy by the defendants; (2) to injure a party or witness in his person or property; (3) because he attended federal court or testified in any matter pending in federal court; (4) resulting in injury or damages to the plaintiff. There is no requirement of class-based animus to state a claim under the first clause of Section 1985(2).  *See Portman v. County of Santa Clara*, 995 F.2d 898, 909 (9th Cir. 1993).  To state a claim under the second clause of Section 1985(2), the plaintiff must allege (1) a conspiracy by the defendants; (2) to impede, hinder, obstruct, or defeat the due course of justice in a state court; intending to deprive any citizen of the equal protection of the laws, i.e., that defendants acted with class-based animus. *Portman, id.*; *Bretz v. Kelman*, 773 F.2d 1026, 1029 (9th Cir. 1985).

     In order to state a claim upon which relief can be granted under Section 1985(3), a plaintiff must allege the following four elements: (1) a conspiracy; (2) for the purpose of depriving,

32

either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of this conspiracy; and (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 828-829 (1983). The second of these four elements requires that in addition to identifying a legally protected right, that the complaint allege that the conspiracy was motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. *Trerice v. Pedersen*, 769 F.2d 1398, 1402 (9th Cir.1985). "To prove a violation of § 1985(3), [Plaintiff] must show 'some racial, or perhaps otherwise class-based, *invidiously discriminatory animus* behind the conspirators' action. The conspiracy, in other words, *must aim at* a deprivation of the equal enjoyment of rights secured by the law to all.'" *Orin v. Barclay*, 272 F.3d 1207, 1217 (9th Cir.2001), quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). "A claim under [Section 1985(3)] must allege facts to support the allegation that defendants conspired together. A mere allegation of conspiracy without factual specificity is insufficient." *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 626 (9th Cir.1988). In *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir.2005), the Ninth Circuit explained:

> The complaint also failed to allege evidence

> of a conspiracy and an act in furtherance of
> that conspiracy, which are required elements
> of a § 1985(3) action ... It is alleged that
> Newell and others conspired to violate the
> Holgate's civil rights, but it did not allege
> that a specific act was committed in
> furtherance of this conspiracy ... While Rule
> 8(a)(2) does not require plaintiffs to law
> out in detail the *facts* upon which their
> claims are based, it does require plaintiffs
> to provide a 'short and plain statement of
> the claim' to give the defendants fair notice
> of what the claim is and the grounds upon
> which it is based.

Here, Defendants argue, the FAC has no allegation of racial or class-based discriminatory animus, pointing to Paragraph 163 of the TAC: "(Need allegations of protected class here)."

Plaintiffs cite *Holgate v. Baldwin*, *supra*, 425 F.3d at 676 (9th Cir.2005), wherein the Ninth Circuit, quoting *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir.1992), stated:

> We have extended § 1985(3) to protect non-
> racial groups only if 'the courts have
> designated the class in question a suspect or
> quasi-suspect classification requiring more
> exacting scrutiny or ... Congress has
> indicated through legislation that the class
> require[s] special protection.' ...
> Plaintiffs did not allege in their complaint
> that they belong to a racial group or
> otherwise protected class, nor did they
> allege that the defendants intentionally
> discriminated against them on such grounds.

Plaintiffs contend that "[i]t is clear that Congress' intent in passing the Individuals with Disabilities Education Act was to indicate that the class of disabled individuals of which Plaintiff P.M. is a member requires special protection." Plaintiffs state that they have found no reported Ninth Circuit case which has specifically extended the protection of Section

1985(3), "on these facts," but "logic dictates that such
protection is to be extended to such persons."

Defendants, referring to the allegations in the Eighth Cause
of Action pertaining to the removal of P.M. from his home without
a warrant, probable cause, or exigent circumstances, and to the
allegations of fabrication of evidence and nondisclosure of
exculpatory evidence in judicial proceedings pertaining to P.M.'s
removal from his home, argue that the provisions of the
Individuals with Disabilities Education Act and cases construing
it do not suggest that the IDEA was intended to provide children
with disabilities or their parents special protections against
the child being detained by law enforcement or being subjected to
the processes of juvenile court beyond the protections that exist
for the public in general.   The IDEA is a comprehensive
educational scheme that confers on students with disabilities a
substantive right to public education.   *See* discussion *supra.*
Here, the FAC does not allege that Defendants conspired to
deprive P.M. of a free, appropriate public education because of
his disability.   Further, as quoted above, the Eighth Cause of
Action does not allege that P.M. or either of his parents are
members of a protected class within the meaning of Section 1985.

Even if P.M. can allege that he is a member of a protected
class, an issue is presented whether his parents can, given the
specific allegations of the Eighth Cause of Action.

Defendants further argue that the allegations of conspiracy
are insufficiently pleaded.

1    Plaintiffs respond that the TAC alleges both the conspiracy

2  between the District Defendants and others and acts in

3  furtherance of that conspiracy in Paragraphs 37, 40, 121, 122,

4  161, and 162.

5    Paragraphs 37 and 40 are set forth in the Common

6  Allegations:

7           37.  The McCues believe and, therefore,
            allege that SHIVE, DAMRON, ZURIN, MIXION, and
8           the DISTRICT and its staff elected,
            intentionally, to disregard their obligations
9           to P.M. under state and federal law, and to
            work toward removing P.M. from the DISTRICT,
10          or otherwise intimidating the McCues so that
            they would not pursue their rights to
11          accommodations for their child.  Plaintiffs
            are further informed and believe and on such
12          basis allege that the DISTRICT sought to
            avoid, and did avoid, its obligations to make
13          reasonable accommodations for P.M.'s
            condition, and did so maliciously.

14          ...

15          40.  After CPS removed P.M. from the McCues'
16          home, P.M. was transferred out of the
            DISTRICT to a school located in Bakersfield,
17          California. SHIVE remained in contact and
            continued to disclose confidential
18          information to Mattel Children's Hospital at
            UCLA, UCLA, its Doctors, and Ms. Borelli
19          without any legal basis to do so.

20  Paragraphs 121 and 122 are set forth in Count Two of the Fifth

21  Cause of Action for Negligent Infliction of Emotional Distress

22  brought by all Plaintiffs against the County Defendants and the

23  District Defendants (a cause of action which must be dismissed

24  for reasons stated above):

25          121.  As detailed above, despite the fact
            that Plaintiff P.M. is allergic to nuts, had
26          a near fatal reaction to nuts, and was

36

1   advised by P.M.'s parents of same, the
    DISTRICT DEFENDANTS refused to make
2   reasonable accommodations for P.M. or under
    his Individualized Education Plan as provided
3   under the Individuals with Disabilities
    Education Act, Section 504 of the
4   Rehabilitation Act, and/or the Americans with
    Disabilities Act, and in fact, on February
5   28, 2008, South Fork Elementary School had an
    event so the middle school and elementary
6   school children were present and all on the
    play ground all at once, wherein South Fork
7   Elementary School served peanut butter
    cookies to all of the students with full
8   knowledge that P.M. was allergic to peanuts.

9       122.   In addition, as detailed above, after
    the DISTRICT and MS. SHIVE stated the School
10  was 'nut free,' on April 16, 2008, the
    DISTRICT passed out a snack to the students
11  in the classroom including P.M. and this
    snack contained nuts and/or nut products.
12  P.M. refused to eat this snack and was given
    another snack.   This only increased P.M.'s
13  fear of school.

14  Paragraphs 161 and 162 are alleged in the Eighth Cause of Action

15  for violation of Section 1985:

16      161.   Specifically, DEFENDANTS conspired to,
    and did: unlawfully seize and remove the
17  minor Plaintiff from the care of his parents,
    without a warrant, court order, consent,
18  probable cause, or exigent circumstances; on
    information and belief denied PLAINTIFFS
19  their right to a hearing on said detention
    within 72 hours of the removal; and continued
20  to detain minor Plaintiff P.M. for an
    unreasonable period after any alleged basis
21  for detention had been negated.

22      162.   In addition, DEFENDANTS, and each of
    them, conspired to use trickery, duress,
23  fabrication and/or false testimony or
    evidence, and failed to disclose exculpatory
24  evidence in preparing and presenting reports
    and court documents to the Court.   The
25  conduct of DEFENDANTS, and each of them,
    interfered with Plaintiffs' rights, including
26  minor Plaintiff's right to be protected

37

1
2
3

> against unlawful seizure under the Fourth
> Amendment of the Constitution of the United
> States, and the right to familial association
> free from government interference as
> guaranteed by the Fourteenth Amendment ....

This mish-mash of allegations does not suffice to allege a conspiracy under Section 1985(2) or (3).  There are no factual allegations that the District Defendants had any involvement in the child endangerment investigation, which the TAC alleges in Paragraph 38 was instituted by the Kern County Sheriff's Department in early February 2008, after the Sheriff's Department received a referral from Dr. Bekmezian at UCLA, or in the decision to remove P.M. from his home.  There are no allegations that the County Defendants had any involvement in the District Defendants' actions or inactions with regard to P.M.'s allergy.

Defendants' motion to dismiss the Eighth Cause of Action is GRANTED WITH LEAVE TO AMEND.  Plaintiffs are referred to the provisions of Rule 11, Federal Rules of Civil Procedure.

E.   Ninth Cause of Action for Violation of 42 U.S.C. § 1986.

The Ninth Cause of Action is brought by all Plaintiffs against all Defendants for violation of Section 1986.  The Ninth Cause of Action "re-alleges, and to the extent applicable, incorporates by reference ... all paragraphs from the Common Allegations ... and the First through Eighth Causes of Action."  The Ninth Cause of Action then alleges in pertinent part:

> 172.  DEFENDANTS, and each of them, maintain,
> and at all times relevant to this Complaint
> maintained, customs and practices which were

38

1    the driving force behind their conspiracy to
interfere with Plaintiffs' civil rights in

2    violation of 42 U.S.C. section 1985, as
alleged above.  Such customs and practices

3    include unreasonable seizures in violation of
the Fourth Amendment of the U.S.

4    Constitution; unlawful removal and detention
of minor children; denial of the right to a

5    hearing on said detention within 72 hours of
removal; continued detention after any

6    alleged basis for detention had been negated
and the procuring of false testimony,

7    fabrication of evidence, and refusal to
disclose exculpatory evidence in preparing

8    and presenting reports and documents to the
Court in relation to dependency proceedings,

9    all in violation of the right to familial
association under the Due Process Clause of

10    the Fourteenth Amendment.

11    173.  DEFENDANTS, and each of them, have, and
at all times relevant to this complaint had,

12    knowledge of the customs and practices that
led to the conspiracy to interfere with

13    Plaintiffs' civil rights.  ALL DEFENDANTS,
and DOES 1 through 100, inclusive, knew that

14    the other individual defendants were
conspiring to commit the wrongs noted above,

15    and were going to commit them.

16    174.  DEFENDANTS, and each of them, had the
power to prevent the commission of these

17    wrongs, through the notification of the
proper superiors and authorities, and/or

18    through the implementation of policies,
procedures, and training programs that would

19    educate and enlighten employees as to the
civil rights of the citizens of the United

20    States and the State of California.

21    175.  Despite their knowledge, DEFENDANTS,
and each of them, refused or neglected to

22    prevent the remaining DEFENDANTS from
committing these wrongs in violation of 42

23    U.S.C. § 1985.  Plaintiffs did in fact suffer
the deprivation of numerous rights granted to

24    citizens of the United States, including
those under the Fourth Amendment that protect

25    against the unlawful seizure of one's person,
and those under the Fourteenth Amendment that

26    protect the right of familial association.

1    42 U.S.C. § 1986 provides:

2         Every person who, having knowledge that any
     of the wrongs conspired to be done, and
3         mentioned in section 1985 of this title, are
     about to be committed, and having power to
4         prevent or aid in preventing the commission
     of the same, neglects or refused so to do, is
5         such wrongful act be committed, shall be
     liable to the party injured ... for all
6         damages caused by such wrongful act, which
     such person by reasonable diligence could
7         have prevented ....

8    A claim can be stated under Section 1986 only if the

9    complaint contains a valid claim under Section 1985.  *Karim-*

10   *Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 626 (9th Cir.

11   1988).

12   Because the motion to dismiss the Eighth Cause of Action is

13   granted with leave to amend, the motion to dismiss the Ninth

14   Cause of Action is GRANTED WITH LEAVE TO AMEND, with the same

15   Rule 11 admonition.

16        F.   Eleventh Cause of Action for Violation of State

17   Civil Rights.

18   The District Defendants move to dismiss the Eleventh Cause

19   of Action.  Plaintiffs do not respond to this ground for

20   dismissal of the FAC.

21   The Eleventh Cause of Action is brought by all Plaintiffs

22   against all Defendants.  The Eleventh Cause of Action "re-

23   alleges, and to the extent applicable, incorporates by reference

24   ... all paragraphs from the Common Allegations ... and the First

25   through Tenth Causes of Action."   The Eleventh Cause of Action

26   then alleges in pertinent part:

40

202.  As a result of DEFENDANTS' conduct, DEFENDANTS, and each of them, by the use of threats, intimidation, and coercion, (or attempts to threaten, intimidate, or coerce), interfered with Plaintiffs' exercise and enjoyment of the rights secured by the United States Constitution and other Federal laws, the Constitution and laws of the State of California, and their rights under California law, including but not limited to California Civil Code sections 43, 49, 51, 52 (The Unruh Civil Rights Act), and 52.1.

...

204.  As to all District Defendants, such conduct includes the refusal to provide reasonable accommodations for P.M. conditions [sic], invasion of privacy, publication of private facts to the other family [sic] at School, among other things.

District Defendants argue that the allegations of the Eleventh Cause of Action leave them "without a reasonable understanding of that for which they are being sued, as District Defendants cannot, with reasonable confidence, ascertain the nature of Plaintiffs' claims, as alleged against District Defendants."

California Civil Code § 43 provides:

Besides the personal rights mentioned or recognized by the Government Code, every person has, subject to the qualifications and restrictions provided by law, the right of protection from bodily restraint or harm, from personal insult, from defamation, and from injury to his personal relations.

California Civil Code § 49 provides in pertinent part:

The rights of personal relations forbids:

(a) The abduction or enticement of a child from a parent, or from a guardian entitled to its custody ....

41

District Defendants further argue that the Eleventh Cause of Action fails to state a claim for violation of California Civil Code § 51.  California Civil Code § 51(b) provides:

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

California Civil Code § 52 provides in pertinent part:

> (a) Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 ... is liable for each and every offense ....

California Civil Code § 52.1(b) provides that "[a]ny individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (b), may institute and prosecute ... a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured."  Section 52.1(a) provides for an action by the Attorney General, district attorney or city attorney "[i]f a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the

42

1  exercise or enjoyment by any individual ... of rights secured by

2  the Constitution or laws of the United States, or the rights

3  secured by the Constitution or laws of this state ....”

4      Research discloses case authority that the term “business

5  establishment” in Section 51 includes public schools.  *See*

6  *Annamarie M. v. Napa Valley Unified School Dist.,* 2006 WL 1525733

7  at *12 (N.D.Cal., May 30, 2006); *Michelle M. v. Dunsmuir Joint*

8  *Union School Dist.*, 2006 WL 2927485 at *7 (E.D.Cal., Oct. 12,

9  2006) and cases cited therein.

10     The District Defendants refer to CACI 3020 that the

11 essential elements of a violation of California Civil Code §§ 51

12 and 52 are (1) that a defendant denied, aided, or incited denial

13 of, discriminated or made a distinction that denied, full and

14 equal privileges to the plaintiff; (2) that a motivating reason

15 for the defendant’s conduct was plaintiff’s sex, race, color,

16 religion, ancestry, national origin, disability, medical

17 condition or other actionable characteristic; (3) that the

18 plaintiff was harmed; and (4) that Defendant’s conduct was a

19 substantial factor in causing a plaintiff’s harm.   The District

20 Defendants contend that the FAC fails to properly plead all of

21 these required elements:

22          Rather, Plaintiffs merely allege broad
            sweeping statements that ‘DEFENDANTS, and
23          each of them, by the use of threats,
            intimidation, and coercion, (or attempts to
24          threaten, intimidate, or coerce), interfered
            with Plaintiffs’ exercise and enjoyment of
25          the rights secured by the United States
            Constitution and other Federal laws,
26          including but not limited to the California

> Civil Code sections 43, 49, 51, 52 (The Unruh
> Civil Rights Act), and 52.1 ... Moreover,
> Plaintiffs utterly fail to allege that the
> motivating reason for the conduct of District
> Defendants was Plaintiffs' sex, race, color,
> religion, ancestry, national origin,
> disability, medical condition or other
> actionable characteristic, as required.

The FAC groups all of the Plaintiffs and all of the District Defendants together with respect to rights and alleged violations.  It is apparent, moreover, from the allegations of the TAC that the alleged violations of Sections 43 and 49 pertain to the County Defendants; there are no allegations that the District Defendants were involved in the investigation of the child endangerment referral or in the decision to remove P.M. from his home.

The motion to dismiss the Eleventh Cause of Action is GRANTED WITH LEAVE TO AMEND.

G.   <u>Twelfth Cause of Action for Intentional Infliction of Emotional Distress</u>.

The District Defendants move to dismiss the Twelfth Cause of Action for Intentional Infliction of Emotional Distress.

The Twelfth Cause of Action is brought by all Plaintiffs against all Defendants.  The Twelfth Cause of Action "re-alleges, and to the extent applicable, incorporates by reference ... all paragraphs from the Common Allegations ... and the First through Eleven [sic] Causes of Action."   The Twelfth Cause of Action alleges in pertinent part:

> 213.  DEFENDANTS, and DOES 1 through 100, and
> each of them, engaged in the above-mentioned

44

1
2
3
4
5
6
7
8
9
10

    extreme, outrageous, unlawful and
unprivileged conduct, including, but not
limited to, removing and detaining minor
Plaintiff P.M. from the love and care of
DARLENE and LAWRENCE without court order or
exigent circumstances; continuing to detain
Plaintiff P.M. for an unreasonable period
after any alleged basis for detention had
been negated; presenting perjured testimony
and fabricating evidence to support their
false and malicious allegations that minor
Plaintiff P.M. were [sic] being abused and/or
neglected by their parents; failing to
disclose exculpatory evidence; questioning
and obtaining information from Plaintiffs
through the use of undue influence, coercion,
and duress; and continuing to harass, annoy,
and lie to Plaintiffs, and otherwise
interfere with Plaintiffs [sic] lives.

11
12
13

    214.  Each of the individual DEFENDANTS, and
DOES 1 through 100, participated in,
conspired with, approved of, and/or aided and
abetted the conduct of the remaining
DEFENDANTS.

14      Under California law, the elements of a claim for

15  intentional infliction of emotional distress are: (1) extreme and

16  outrageous conduct by the defendant with the intention of

17  causing, or reckless disregard of the probability of causing,

18  emotional distress; (2) the plaintiff's suffering severe or

19  extreme emotional distress; and (3) actual and proximate

20  causation of the emotional distress by the defendant's outrageous

21  conduct.  *Hergenroeder v. Travelers Property Cas. Ins. Co.,* 249

22  F.R.D. 595, 620 (E.D.Cal.2008).  Conduct to be outrageous must be

23  so extreme as to exceed all bounds of that usually tolerated in a

24  civilized community.  *Id.*

25      The District Defendants argue that the allegations of the

26  Twelfth Cause of Action are conclusory and appear to be based on

45

1    conduct by the County Defendants.

2        Plaintiffs respond that the allegations in Paragraphs 24,

3    25, 37, 41, 42 and 51 of the FAC suffice to allege that the

4    individual District Defendants engaged in extreme and outrageous

5    conduct directed at Plaintiffs:

6            24.   During the remainder of the 2006-2007
             school year there were several meetings with
7            the DISTRICT and its employees at which
             Plaintiffs requested the DISTRICT consider
8            stop serving nut products, nuts, or food
             items containing nut products at the School
9            to protect P.M. from any adverse reactions.
             At those meetings, SHIVE repeatedly stated
10           that the DISTRICT and the School, and the
             staff at those locations where P.M. received
11           his education could not, and would not, stop
             serving nuts as requested by the McCues.  As
12           a result, the DISTRICT, School, SHIVE,
             SHANNON DAMRON ('DAMRON,' the Second Grade
13           Teacher at South Fork), KAREN ZURIN ('ZURIN,'
             the Office Assistant at South Fork), and
14           SABINE Mixion ('MIXION'), and each of them
             personally refused to make any reasonable
15           accommodations for P.M. or under his
             Individualized Education Plan as provided
16           under the Individuals with Disabilities
             Education Act, Section 504 of the
17           Rehabilitation Act, and/or the Americans with
             Disabilities Act.

18
             25.   P.M. started his second grade year on
19           August 21, 2007.  At the beginning of P.M.'s
             2007-2007 school year, the McCues held
20           another meeting with SHIVE.  The McCues again
             requested accommodations for P.M. to keep him
21           safe.  At this time, SHIVE allegedly stated
             to Plaintiffs, 'We had a nut free table for
22           [P.M.] last year but we cannot do that this
             year, all we can do to accommodate [P.M.] is
23           to make him eat his lunch in the office away
             from all other children and this will keep
24           him safe.'  The McCues were dissatisfied with
             this response and voiced their
25           dissatisfaction.  Several meetings after this
             change in circumstance, the McCues requested
26           accommodations to allow P.M. to eat his lunch

                                 46

in the lunchroom with all his friends.
However, SHIVE continued to insist that
eating in the office is all she, the
DISTRICT, and the School would do to
accommodate him during his lunch hour.

...

37.  The McCues believe and, therefore,
allege that SHIVE, DAMRON, ZURIN, MIXION, and
the DISTRICT and its staff elected,
intentionally, to disregard their obligations
to P.M. under state and federal law, and to
work toward removing P.M. from the DISTRICT,
or otherwise intimidating the McCues so that
they would not pursue their rights to
accommodations for their child.  Plaintiffs
are further informed and believe and on such
basis allege that the DISTRICT sought to
avoid, and did avoid, its obligations to make
reasonable accommodations for P.M.'s
condition, and did so maliciously.

...

41.  Defendant SHIVE called Plaintiff DARLENE
on the telephone on March 7, 2009 [sic], the
morning after P.M. was taken away from the
McCues by CPS.  She already knew P.M. had
been removed and detained.  During the
telephone conversation she sarcastically
asked DARLENE 'How is [P.M.]?'  When
Plaintiff DARLENE responded, SHIVE, in a
retaliatory and threatening manner,
responded: 'Well, when you have a problem
with me, you don't call the School [sic]
Board of Education.  You deal with me only.'
SHIVE intimated that she was in fact the
driving force behind P.M.'s removal and
detention, and that said removal was in
retaliation for DARLENE's efforts to lawfully
obtain reasonable accommodations for her son.

42.  On March 10, 2008, without Plaintiffs'
knowledge or consent, Ms. DAMRON, P.M.'s
teacher at the DISTRICT, announced to P.M.'s
whole class with all classmates present that
'P.M. had been taken away from his parents
and put in a foster home and now he will be
safe and he would not be coming back.'  In
the afternoon on March 10, 2008, the McCues

47

1   began receiving telephone calls from parents
    of children in P.M.'s class asking if it was
2   true that P.M. had been taken away.  The
    McCues told the parents it was true and asked
3   how they found this out.  The parents of
    P.M.'s classmates stated that their children
4   came home telling them that Ms. Damron
    announced to the class after lunch that P.M.
5   had been taken away from his parents and put
    in a foster home and that he would now be
6   safe and would not be coming back to school
    in violation of the McCue's [sic]
7   constitutional right to privacy arising under
    Article 1, Section 1 of the California
8   Constitution.  The McCues then received
    letters from several children and their
9   families describing what Ms. DAMRON had
    stated.

10      ...

11
        51.  Due to P.M.'s removal from his Parents,
12  missing school and abuse at the second foster
    home, he developed extreme anxiety and became
13  afraid to eat the food at school given the
    incident with the peanut butter cookies at
14  the School.  He has been diagnosed with Post
    Traumatic Stress Disorder.  To complicate
15  this, after the DISTRICT and MS. SHIVE stated
    the School was 'nut free,' on April 16, 2008,
16  the DISTRICT passed out a snack to the
    students in the classroom and this snack
17  contained nuts and/or nut products.  P.M.
    refused to eat this snack and was given
18  another snack.  This only increased P.M.'s
    fear of school.

19
        The motion to dismiss the Twelfth Cause of Action is GRANTED
20
WITH LEAVE TO AMEND.  Plaintiffs shall allege concise and
21
succinct facts from which it may be inferred that each Defendant
22
is liable for intentional infliction of emotional distress as to
23
each Plaintiff.
24
        H.   Fourteenth Cause of Action for Slander.
25
        The District Defendants move to dismiss the Fourteenth Cause
26

                                    48

of Action for Slander.

The Fourteenth Cause of Action is brought by Plaintiff Darlene and Lawrence McCue against the District Defendants and Does 1 - 100.  The Fourteenth Cause of Action "re-alleges, and to the extent applicable, incorporates by reference ... all paragraphs from the Common Allegations."  The Fourteenth Cause of Action then alleges in pertinent part:

> 240.  Defendant Damron published false statements to all of P.M.'s class mates [sic], after P.M.'s removal and detention from his family home.  Said statements were false at the time Damron made them.  Said false statements were of and concerning DARLENE, LAWRENCE, and P.M.

> 241.  The aforementioned false statements were made to the children without privilege, and with knowledge of their falsity.

> 242.  The false statements were injurious to the reputations of DARLENE, LAWRENCE, and P.M. in the community, in that they tended to subject DARLENE, LAWRENCE, and P.M. to hatred, ridicule, or contempt.  Moreover, the statements implied that DARLENE and LAWRENCE were guilty of child abuse, when in fact they were not.

The District Defendants move to dismiss the Fourteenth Cause of Action on the ground that the truth of the alleged slanderous statement is a complete defense to slander, a contention not challenged by Plaintiffs.  *See Conkle v. Jeong*, 73 F.3d 909, 917 (9th Cir.1995), *cert. denied*, 519 U.S. 811 (1996)("Truth is a complete defense to slander, 'regardless of the bad faith or malicious purpose of the publisher of the material.').

The only allegations pertaining to Defendant Damron's

allegedly slanderous statement are set forth in Paragraphs 42:

> 42.  On March 10, 2008, without Plaintiffs'
> knowledge or consent, Ms. DAMRON, P.M.'s
> teacher at the DISTRICT, announced to P.M.'s
> whole class with all classmates present that
> 'P.M. had been taken away from his parents
> and put in a foster home and now he will be
> safe and he would not be coming back.'  In
> the afternoon on March 10, 2008, the McCues
> began receiving telephone calls from parents
> of children in P.M.'s class asking if it was
> true that P.M. had been taken away.  The
> McCues told the parents it was true and asked
> how they found this out.  The parents of
> P.M.'s classmates stated that their children
> came home telling them that Ms. Damron
> announced to the class after lunch that P.M.
> had been taken away from his parents and put
> in a foster home and that he would now be
> safe and would not be coming back to school
> in violation of the McCue's [sic]
> constitutional right to privacy arising under
> Article 1, Section 1 of the California
> Constitution.  The McCues then received
> letters from several children and their
> families describing what Ms. DAMRON had
> stated.

Plaintiffs respond that the alleged statement by Defendant Damron that 'P.M. had been taken away from his parents and put in a foster home *and now he will be safe* ...'' implies that P.M. was not safe with his parents:

> This portion of DAMRON'S statement was
> utterly false; P.M. was never at risk with
> his parents nor had his parents ever harmed
> him.  In fact, on the October 28, 2009 [sic],
> the Juvenile Court dismissed the petition
> against Plaintiffs GRACIE [sic] and LAWRENCE
> and returned their child P.M. to their care,
> custody and control.  No allegations of abuse
> or neglect were ever sustained.

In their reply brief, the District Defendants note  that the only allegedly false statement attributed to Defendant Damron is

"now he will be safe."   The District Defendants refer to cases

involving the gist or sting of the allegedly slanderous

statement.   As explained in *Ringler Associates, Inc. v. Maryland*

*Cas. Co.*, 80 Cal.App.4th 1165, 1180-1181 (2000):

> It is the defendant's burden to 'justify,' or
> show the truth of the statements ...
> Significantly, however, the defendant need
> not justify the literal truth of *every word*
> of the allegedly defamatory matter.   It is
> sufficient if the *substance* of the charge is
> proven true, irrespective of slight
> inaccuracies in the details, 'so long as the
> imputation is substantially true so as to
> justify the "gist or sting" of the remark.'
> ....

The District Defendants argue that the allegations in the FAC

establish that the Fourteenth Cause of Action satisfies this

test, referring to the allegations in Paragraph 43 that CPS

placed P.M. in a foster home in Bakersfield, and to the

allegations in Paragraph 42 that when asked by other parents if

it was true that P.M. had been taken away, the McCues stated that

it was true:

> [T]he allegations of the FAC and Plaintiffs'
> Opposition clearly show that Ms. Damron's
> allegedly slanderous statement and any
> imputation therefrom was substantial [sic]
> true so as to justify the 'gist' or 'sting'
> of the remark.   This is because the
> gist/primary message of the alleged statement
> was that P.M. has been placed in a foster
> home.

Obviously, children are not normally removed to a foster

home unless there is concern for their safety and it is

absolutely true that P.M. was removed from his parents and placed

in a foster home.   However, whether the contested statement was

51

1  slanderous presents a question of fact for summary judgment or

2  trial.

3      Defendants' motion to dismiss the Fourteenth Cause of Action

4  is DENIED.[4]

CONCLUSION

6      For the reasons stated:

7      1.  Defendants' motion to dismiss is GRANTED IN PART WITH

8  PREJUDICE, GRANTED IN PART WITH LEAVE TO AMEND, AND DENIED IN

9  PART;

10     2.  Plaintiffs shall file a First Amended Complaint in

11 accordance with the rulings herein within thirty (30) days of the

12 filing date of this Memorandum Decision and Order.

13     IT IS SO ORDERED.

14 Dated:   May 20, 2010                    /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE

---

[4]The Fourteenth Cause of Action prays for punitive damages.
To the extent that this prayer for relief is directed to South Fork
Union School District, California Government Code § 818 provides:

> Notwithstanding any other provision of law, a
> public entity is not liable for damages
> awarded under Section 3294 of the Civil Code
> or other damages imposed primarily for the
> sake of example and by way of punishing the
> defendant.

52